GEORGE A. STILES, Respondent, v BATAVIA ATOMIC HORSESHOES, INC., Appellant and Third-Party Plaintiff-Respondent. RECORDS RESERVE CORPORATION, Third-Party Defendant-Appellant.

Fourth Department, January 31, 1992

APPEARANCES OF COUNSEL

*Raymond W. Bulson* for appellant and third-party plaintiff-respondent.

*Hurwitz & Fine, P. C. (Theordore Burns* of counsel), for third-party defendant-appellant.

*James J. Moran* for respondent.

OPINION OF THE COURT

GREEN, J.

On October 19, 1979 plaintiff, then 19 years of age and a

general laborer, was seriously injured when a 56-ton punch press that he was operating malfunctioned and crushed both of his hands. Plaintiff was employed by third-party defendant Records Reserve Corporation (Records), who purchased the press from defendant Batavia Atomic Horseshoes, Inc. (Batavia). Batavia bought the press at an auction and sold it immediately thereafter to Records. Records installed the press at its factory a few weeks before plaintiff's accident. The accident occurred as plaintiff was attempting to unjam the press by prying broken pieces of metal out of the upper part of the die. The ram of the press unexpectedly recycled and came crashing down on his hands, which were inside the stamping area. Plaintiff lost three fingers on his right hand and suffered deformity to his left hand.

In 1982 plaintiff commenced the instant action against Batavia alleging negligence, strict product liability and breach of warranty and seeking compensatory and punitive damages. Between January 1978 and March 1980 Batavia operated as a small manufacturer of horseshoes and also engaged in buying and selling used industrial machinery, including the punch press which injured plaintiff. Thereafter, Batavia filed for bankruptcy. During discovery plaintiff learned that Batavia had no insurance coverage and minimal assets. Plaintiff's counsel informed Batavia's counsel that if he did not implead Records and if a substantial judgment was rendered against Batavia, he would make every effort to reopen the bankruptcy or attempt to pierce Batavia's corporate veil to satisfy a judgment out of the personal assets of Batavia's principals. Batavia then impleaded Records.

At trial, plaintiff established that Batavia purchased the punch press in question along with four other punch presses for a total of $1,500, or $300 each. Batavia kept two of the presses and sold the other three—two for $1,800 each, and the one which injured plaintiff for $3,000. The press was not then equipped with any safety guards or warnings and was in the same condition as it was when Batavia bought it. Approximately one week before the accident an Occupational Safety and Health Administration (OSHA) inspector conducted a routine inspection of the Records plant and recommended a list of over 20 safety modifications which Records should make to the punch press, including the addition of safety guards to prevent an operator's hand from being crushed in the die area of the press. Immediately after the inspector left, however,

Records' owner removed the inspector's list and ordered plaintiff to continue operating the press.

At trial, a critical issue relating to plaintiff's cause of action for strict product liability was whether Batavia was a regular, or only an occasional, seller of used machinery. Plaintiff established that during the two years Batavia was in business, Batavia bought and resold used industrial machinery on at least two other occasions, one before and the other after the auction at which Batavia bought the punch press in question. Plaintiff also established that on each occasion Batavia realized a substantial profit on the sale of the used machinery.

The court submitted the following interrogatory to the jury: "At the time of the sale of the punch press was Batavia Atomic Horseshoes engaged in the sale of used punch presses as a regular part of its business?" The jury unanimously found that it was, that the punch press was defective when Batavia resold it to Records and that such defect proximately caused plaintiff's injuries. The jury awarded plaintiff $1,705,000, without itemizing its verdict, and apportioned fault 4% to plaintiff, 15% to Batavia and 81% to Records.

Records and Batavia argue on appeal that Batavia was only an occasional seller of used products and cannot be held liable under strict product liability as a matter of law and that the verdict is excessive. Records additionally argues that sellers (occasional or not) of used products cannot be liable in strict product liability, that Batavia had no duty to warn, that the product was not ready for its intended use, that plaintiff's counsel and Batavia's counsel had an improper *Mary Carter* agreement and that the trial court erred in not requiring an itemized verdict.

■ The Court of Appeals held in *Sukljian v Ross & Son Co.* (69 NY2d 89, 95) that an occasional seller of a used product is not subject to strict product liability. Implicit in this holding is that a nonoccasional or regular seller of a used product may be strictly liable, as other State courts have held *(see, e.g., Jordan v Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz 309, 660 P2d 1236; *Thompson v Rockford Mach. Tool Co.,* 49 Wash App 482, 744 P2d 357; *Turner v International Harvester Co.,* 133 NJ Super 277, 336 A2d 62; *Cornelius v Bay Motors,* 258 Ore 564, 484 P2d 299; *Realmuto v Straub Motors,* 65 NJ 336, 322 A2d 440; *see also,* Annotation, *Strict Liability in Tort: Liability of Seller of Used Product,* 53 ALR3d 337). Those decisions are based primarily upon policy

considerations that sellers of used products, like sellers of new products, have assumed a special responsibility to the public, may spread the loss caused by defective products and have the ability and knowledge to remove defects before placing the used product in the distribution chain. Of course, privity is no longer required in an action for personal injury based upon strict product liability *(see, Heller v U.S. Suzuki Motor Corp., 64 NY2d 407)*. Moreover, there is nothing in section 402A of the Restatement (Second) of Torts* which would preclude such liability and the imposition of strict liability upon sellers of used products should result in increased maintenance and inspection. Since the punch press which injured plaintiff was operational and ready for its intended use when Batavia sold it to Records *(cf., Frederick v Niagara Mach. & Tool Works, 107 AD2d 1063)*, there is nothing to prohibit imposition of strict product liability upon Batavia, as a matter of law.

Thus, the trial court, based upon the evidence, properly submitted to the jury the question (formulated by Records' counsel) whether the sale of used punch presses was a regular part of Batavia's business when it sold the punch press in question to Records *(see, Galindo v Precision Am. Corp., 754 F2d 1212, reh denied 762 F2d 1004)*. Batavia's president testified that Batavia purchased the lot of punch presses at the auction specifically intending to sell some of them. Batavia's owner acknowledged that Batavia engaged in the business of buying and selling used industrial machinery and that Batavia did so at least once before and once after the sale to Records involved here. Although a total of three transactions does not necessarily establish that Batavia was a regular seller of used machinery *(cf., Goldman v Packaging Indus., 144 AD2d 533, 536 [3 used machines sold in 27 years])*, the trial court was aware that Batavia was in business for only two years before declaring bankruptcy. Other factors to consider in determining whether a defendant is an occasional or regular seller are the nature of the transaction and whether a profit is made *(see, Perazone v Sears, Roebuck & Co., 128 AD2d 15, 21)*. Here, the transaction between Batavia and Records was clearly commercial and Batavia realized a substantial profit, having purchased the press for only $300 and immediately selling it for $3,000.

---

* Although the Court of Appeals has declined to adopt section 402A as a statement of New York law *(Micallef v Miehle Co., 39 NY2d 376, 387-388)*, it has referred to it in support of its adoption of strict liability *(see, Robinson v Reed-Prentice Div., 49 NY2d 471, 479)*.

Since the jury verdict based upon strict product liability was proper, there is no need to address plaintiff's negligence cause of action based on a failure to warn. We note only that even a casual seller has a duty to warn of known defects which are not obvious or readily discernible (see, *Sukljian v Ross & Son Co.*, 69 NY2d 89, 97, *supra*).

Records also argues that there was a *Mary Carter* agreement. Such an agreement is a contract by which one or more defendants in a multiparty case secretly conspires with the plaintiff to feign an active role in the litigation in exchange for assurances that its own liability will be diminished proportionately by increasing the liability of the nonagreeing defendant(s) (see, *Booth v Mary Carter Paint Co.*, 202 So 2d 8 [Fla App 1967]). If such an agreement is established, it may be void per se (see, *Cox v Kelsey-Hayes Co.*, 594 P2d 354 [Okla 1979]), and the failure to disclose it may require a new trial (see, *Ward v Ochoa*, 284 So 2d 385 [Fla 1973]).

The court held a separate hearing on that issue. The court's finding that Records did not establish the existence of such an agreement is supported by the record. Plaintiff's counsel, faced with the possibility of an insolvent defendant, strongly encouraged Batavia to implead Records as a source of recovery. This does not amount to collusion characteristic of a *Mary Carter* agreement (see, *Ward v Ochoa, supra*, at 387). Moreover, although Batavia did not vigorously defend plaintiff's lawsuit, Batavia's limited financial condition may not have allowed it to do so. All negotiations between Batavia's trial counsel and plaintiff's trial counsel were conducted with the knowledge of the trial court and often in the presence of the court. More troubling, however, is the fact that Batavia's trial counsel was not paid for his legal services in defending Batavia and that within a few months after the trial, he closed his law office and moved his practice to the office of plaintiff's attorney. Nevertheless, we agree with the court's finding that "The surrounding circumstances as to a former counsel's relationship with the defendant and plaintiff's counsel, though suspect, [do]es not require the inference that counsel for plaintiff and Batavia Atomic Horseshoes acted in concert against Records Reserve. The proof does show that former counsel's later retainer by an authorized representative of the defendant corporation was untimely, and he did subsequently move his law practice to the office of plaintiff's attorney following the verdict. Each created an appearance of impropriety. However, the former is also consistent with the

genuineness of plaintiff's prior threats to pierce the corporate veil; and, as to the latter, the proof that only an office sharing arrangement existed, is materially uncontroverted. Considering such, I find that there is insufficient foundation to warrant an inference therefrom."

■ Addressing Records' remaining contentions, we find that the verdict is not excessive. Plaintiff suffered severe injuries to both hands requiring four surgeries. He lost three fingers on his right hand. The index and middle fingers were totally amputated and one of the amputated fingers was fused to the site of plaintiff's right thumb. Plaintiff's left hand is deformed because his index and middle fingers are shortened and his little finger is scarred. A State medical examiner evaluated the loss of plaintiff's right hand and arm at 85% and the loss of his left hand at 37½%. Plaintiff's rehabilitation expert testified that these impairments equate with a 61% permanent disability of plaintiff's body. Plaintiff was only 19 years of age when the accident occurred. Moreover, although the verdict was not itemized, there may have been a basis in the record for an award of punitive damages because Records' president disregarded the OSHA inspector's warnings only a week before the accident. Although the verdict should have been itemized *(see,* CPLR 4111 [f]), the error is harmless because Records did not request an itemized verdict. Moreover, the court was not obligated to adjust the verdict to present value because CPLR 5041 (e) did not become effective until after this action was commenced *(see, Hudson v Manhattan & Bronx Surface Tr. Operating Auth.,* 150 Misc 2d 283, 284). In any event, in his testimony plaintiff's expert reduced plaintiff's projected future lost income to present value.

Accordingly, the judgment should be affirmed in all respects.

DENMAN, P. J., BOOMER, PINE and DAVIS, JJ., concur.

Judgment unanimously affirmed, with costs.